**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| UTILITY TRAILERS OF INDIANAPOLIS, INC., and, PETERBILT OF INDIANA, INC., <br><br>  Plaintiffs, <br><br> v. <br><br> UTILITY TRAILER MANUFACTURING COMPANY, <br><br>  Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) )  Case No. 1:11-cv-01597-TWP-DML |

**ENTRY ON CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

This matter is before the Court on Plaintiffs Utility Trailers of Indianapolis, Inc.'s (the "Seller") and Peterbilt of Indiana, Inc.'s ("Peterbilt") (collectively "Plaintiffs") Motion for Partial Summary Judgment (Dkt. 35), and Defendant Utility Trailer Manufacturing Company's ("Utility") Cross-Motion for Partial Summary Judgment (Dkt. 60). The parties each argue that they are entitled to partial summary judgment on the issue of whether Utility violated the notice provision of Indiana Code § 9-23-3-22, thus committing an unfair practice and constructively approving the transfer of the Seller's trailer dealership business to Peterbilt. For the reasons set forth below, Utility's motion is **GRANTED** and the Seller's and Peterbilt's motion is **DENIED**.

## I. BACKGROUND

The following material facts are not in dispute for purpose of the parties' motions. Utility is a manufacturer of semi-trailers. The Seller has been a Utility trailer dealer since approximately 1979. Utility has a general policy against permitting its dealers to sell both trucks and semi-trailers, a practice often referred to as "dueling," because in Utility's experience it has found that these dual dealers tend to focus more attention and resources on the truck side of their

business to the detriment of the trailer side of the business. Nevertheless, sometime after Seller became a Utility trailer dealer, Utility consented to Seller's request to become a "dueling" dealer based upon particular circumstances which existed in the market at that time.

In Indiana, this type of transaction is regulated by statute. Under Indiana Code § 9-23-3-22, a dealer is required to obtain the consent of a manufacturer or distributor prior to transferring its business and assets to another entity where that transfer contemplates or is conditioned upon the continuation of the franchise relationship between the manufacturer and the transferee. On July 15, 2011, Seller entered into an asset purchase agreement with JX Enterprises, Inc. ("JX") whereby Seller was to sell substantially all of its assets to JX under the terms of an Asset Purchase Agreement (the "Purchase Agreement") (the "Proposed Sale").[1] Thereafter, JX assigned all its rights in and to the Purchase Agreement to its direct and wholly owned subsidiary, Peterbilt, under the terms of an assignment agreement (the "Assignment Agreement"). Some time prior to July 19, 2011, Harold "Steve" Riddle ("Mr. Riddle") on behalf of the Seller and Bob Conlee ("Mr. Conlee"), Director of Dealer Relations at Utility, had a telephone conversation in which Mr. Riddle informed Mr. Conlee that JX and Seller had entered into the Purchase Agreement, and that Seller wanted to transfer its trailer dealership to JX. Mr. Conlee informed Mr. Riddle that Utility would not approve the sale. However, despite having voiced its disapproval, Utility e-mailed a dealer application to Seller on July 19, 2011 (the "Application"). On July 21, 2011, Eric Jorgensen ("Mr. Jorgensen") from JX e-mailed Mr. Conlee asking to meet with Utility to discuss JX's desire to take over the Seller's trailer dealership. The same day, Mr. Conlee responded to Mr. Jorgensen via e-mail and stated that, based upon Utility's policy, that being, Utility would not approve the dealership transfer, so such

---

[1] Plaintiffs' briefs repeatedly state that the Purchase Agreement was between Seller and Peterbilt; however, a copy of the Purchase Agreement shows that the Purchase Agreement was entered into between Seller and JX Enterprises, Inc. Dkt. 64-2 at 3.

a meeting would not be useful. Mr. Jorgensen responded, again via e-mail, that he respected that corporate policy and found it "unfortunate that other multiple location, truck and trailer franchise dealers set a sour taste over the years with Utility." Dkt. 62-2 at 2.

Not to be deterred, JX filled out and sent the Application to Utility on July 29, 2011, via United Parcel Service, and Utility received the Application on August 1, 2011. JX left several questions on the Application blank, and the Application did not include a copy of the Purchase Agreement, the Assignment Agreement, or any other agreements related to the Proposed Sale. On August 3, 2011, Mr. Riddle sent an e-mail to Harold Bennett ("Mr. Bennett"), president of Utility, to again request that Utility accept JX's Application to acquire the Seller's dealership. Mr. Bennett responded the following day and reiterated Utility's decision not to approve JX's Application, stating that their position was "not negotiable." Dkt. 62-4 at 2.

The Seller did not send a copy of the Purchase Agreement to Utility until September 25, 2011, almost two months after JX submitted the Application. The version of the Purchase Agreement sent to Utility did not include the schedules to the agreement. On October 7, 2011, Seller entered into a management agreement with Peterbilt to supervise and manage the Utility trailer portion of Seller's operations (the "Management Agreement"), which Utility did not learn about until April 2012, after this lawsuit had been filed. Utility did not receive a copy of the Management Agreement until Seller produced it in discovery. The Assignment Agreement between JX and Peterbilt was never sent to Utility, nor has it been produced to Utility during the course of this litigation.

Utility has refused to allow the Proposed Sale to go forward and refuses to recognize Peterbilt as a Utility dealer. Utility did not send written correspondence via certified mail to

Seller, Peterbilt, or JX regarding its reasons for disapproving the Proposed Sale, and the only communications regarding its disapproval were via e-mail and telephone.

## II. LEGAL STANDARD

Summary judgment is only appropriate by the terms of Rule 56(c) where there exists "no genuine issue as to any material facts and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. This notion applies equally where, as here, opposing parties each move for summary judgment in their favor pursuant to Rule 56. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774 (7th Cir. 1996). Indeed, the existence of cross-motions for summary judgment does not necessarily mean that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., Inc. v. Int'l Union of Operating Eng'rs.*, 335 F.3d 643, 647 (7th Cir. 2003). Rather, the process of taking the facts in the light most favorable to the nonmovant, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. "With cross-motions, [the Court's] review of the record requires that [the Court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Ins.*, 246 F.3d 975, 983 (7th Cir. 2001) (quoting *Hendricks–Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

## III. DISCUSSION

Seller and Peterbilt allege that Utility's communications regarding its disapproval of the Proposed Sale were not in accordance with Indiana Code § 9-23-3-22(b) because it failed to send a copy of a written notice providing the "material reasons" for disapproving the transfer via certified mail within sixty days of receiving notice of the Proposed Sale and, therefore, the Court should find that Utility constructively approved the sale in accordance with Indiana Code § 9-23-3-22(b), and that Utility committed an unfair practice under Indiana Code § 9-23-3-22(d).

Utility, in its cross-motion, argues that Seller and Peterbilt did not comply with the requirements of Indiana Code § 9-23-3-22(a) because they failed to provide Utility with all of the information required in that subsection, thus its obligation to send such a notice was never triggered.

A.    **Statutory Interpretation of Indiana Code § 9-23-3-22**

Indiana courts have not had the occasion to address the requirements for dealers and manufacturers under Indiana Code § 9-23-3-22.  When a federal court must interpret and apply an Indiana statute "we look to see how Indiana courts address a statutory interpretation issue of first impression." *Brownsburg Area Patrons Affecting Change v. Baldwin*, 137 F.3d 503, 508 (7th Cir. 1998) *certified question answered*, 714 N.E.2d 135 (Ind. 1999).  "Indiana courts will not engage in statutory interpretation unless the language of the statute is ambiguous. . . .  If the statute is not ambiguous, the court will give effect to the plain, ordinary, and usual meaning of the language of the statute." *Brownsburg*, 137 F.3d at 508 (citing *Amoco Prod. Co. v. Laird*, 622 N.E.2d 912, 915 (Ind. 1993); *Indiana v. CSX Transp., Inc.*, 673 N.E.2d 517, 519 (Ind. Ct. App. 1996)); *see also Miller v. LaSalle Bank Nat. Ass'n*, 595 F.3d 782, 786 (7th Cir. 2010).  Under Indiana law, the primary purpose of statutory interpretation is to ascertain and give effect to the legislature's intent, and the statute itself is the best evidence of this intent. *Nicoson v. State*, 938 N.E.2d 660, 663 (Ind. 2010).  "The first and often the only step in resolving an issue of statutory interpretation is the language of the statute." *State, Ind. Civil Rights Comm'n v. Indianapolis Newspapers, Inc.*, 716 N.E.2d 943, 946 (Ind. 1999) (quoting *Shell Oil Co. v. Meyer*, 705 N.E.2d 962, 972 (Ind. 1998)).

The Court must first determine whether the language in the statue at issue is ambiguous. The pertinent portions of Indiana Code § 9-23-3-22 state:

> (a) A dealer may not transfer, sell, or assign the business and assets of a dealership or an interest in the dealership to another person that contemplates

>> or is conditioned upon a continuation of the franchise relationship with the manufacturer or distributor unless the dealer first:
>>
>>> (1) notifies the manufacturer or distributor of the dealer's decision to make the transfer, assignment, or sale by written notice; and
>>>
>>> (2) obtains the approval of the manufacturer or distributor.
>>
>> The dealer must provide the manufacturer or distributor with *completed* application forms and related information generally used by the manufacturer or distributor to conduct its review of such a proposal, and a copy of *all* agreements regarding the proposed transfer, assignment, or sale.
>
> (b) The manufacturer or distributor shall send a letter by certified mail to the dealer *within sixty (60) days of receipt of the information specified in subsection (a)*. The letter must indicate any disapproval of the transfer, assignment, or sale and must set forth the material reasons for the disapproval. If the manufacturer or distributor does not respond by letter within the sixty (60) day period, the manufacturer's or distributor's consent to the proposed transfer, assignment, or sale is considered to have been granted. A manufacturer or distributor may not unreasonably withhold approval of a transfer, assignment, or sale.
>
> (c) . . .
>
> (d) Violation of this section by the manufacturer or distributor is an unfair practice by a manufacturer or distributor.

I.C. § 9-23-3-22 (emphasis added). Seller and Peterbilt argue that the requirements of subsection (b) are not ambiguous, but that "room exists for interpretation" with regard to the requirements of subsection (a) and that the statute "provides broad leeway" for the Court's interpretation of what constitutes compliance on the part of the dealer. Dkt. 78 at 6. The Court disagrees with the Plaintiffs' characterization of subsection (a).

Indiana Code § 9-23-3-22(a) requires that a dealer submit a "completed application" and include a copy of "all agreements" regarding the proposed transfer. There is nothing ambiguous about this language that would lead the Court to adopt Seller's interpretation that providing a "substantially answered" application form completed by the proposed transferee is sufficient for

6

purposes of the statute. *See* Dkt. 78 at 7. The statute specifically uses the word "completed" with reference to the application, not "substantially completed." In addition, there is no ambiguity in the language requiring that "*all* agreements regarding the proposed transfer" be submitted to the manufacturer under subsection (a), which would include, at a minimum, the Purchase Agreement and documents affecting the ultimate transfer to and management of the dealership by Peterbilt, i.e. the Assignment Agreement and the Management Agreement. It is clear from the face of the statute that the purpose behind the requirement that the dealer provide this information is so that the manufacturer can make an informed decision as to whether it desires to continue a franchise relationship with the new dealer. This purpose would not be served if a dealer were permitted leeway to submit incomplete information to the manufacturer, particularly as it relates to what entity would ultimately be selling the manufacturer's products, yet still require the manufacturer to provide a timely notice of its decision. With regard to the requirements of Indiana Code § 9-23-3-22(b), the plain language of the statute states that the manufacturer's obligation to send a notice of its decision not to approve the transfer is predicated on the receipt of the information in subsection (a), and the sixty day period does not begin to run until the manufacturer receives the specified information and documentation.

**B.     The Parties' Compliance Under Indiana Code § 9-23-2-22.**

Based upon the evidence presented by the parties, there is no dispute of material fact as to whether Plaintiffs complied with subsection (a) of the statute, and whether Utility's obligations were thus triggered under subsection (b). The Court finds that they did not. First, the copy of the Application, which was completed by JX and not Seller or Peterbilt, shows that some answers were omitted, and Plaintiffs admit in their answers to the First Request for Admissions that these questions were left blank. *See* Dkts. 64-1 at 6-8; 62-8 at 4-5; 62-9 at 4-5. These

omissions indicate that the Application was not "completed" as required by the statute. Second, Seller and Peterbilt admitted that they did not provide the Purchase Agreement to Utility, and even denied that they were required to submit the Purchase Agreement—an agreement clearly related to the proposed transfer—which is contrary to the unambiguous language in the statute. *See* Dkts. 62-1 at 5; 62-2 at 5. Utility states that it did eventually receive a copy of the Purchase Agreement two months after receiving the Application, but it too was incomplete because the schedules were omitted. *See* Dkt. 64-2. Finally, Utility did not receive a copy of the Management Agreement—an agreement which dictated who would be responsible for the management of the Utility trailer dealership portion of Seller—until after this lawsuit was filed (Dkt. 64-4) and still has never received a copy of the Assignment Agreement—an agreement which dictated who the ultimate owner of Seller's Utility trailer dealership would be. These three agreements are all clearly "regarding the proposed transfer" and should have been submitted, in their entirety, as part of the Application sent to Utility under Indiana Code § 9-23-3-22(a).

Plaintiffs ask the Court to strictly construe the statute against Utility and find that notice of its disapproval provided via telephone and e-mail does not fulfill the requirement that communication be sent via certified mail; however, under Indiana law "[o]ne who claims a statutory right must bring himself within the provisions of the statute." *Johnson v. Toth*, 516 N.E.2d 85, 86 (Ind. Ct. App. 1987); *see also SLR Plumbing & Sewer, Inc. v. Turk*, 757 N.E.2d 193, 199 (Ind. Ct. App. 2001) (finding that subcontractor's notice did not comply with statutory requirements and thus was insufficient to trigger property owners' obligation under mechanic's lien statute). Plaintiffs argue that Utility did not require the Seller and Peterbilt to comply with the statute because it did not request the additional documentation, and that Utility's telephone

8

and e-mail responses indicate that it received proper notice of the Proposed Sale. Dkt. 78 at 7. However, there is nothing in the statute requiring the manufacturer to request such information; the burden is on the dealer to provide the information indicated in subsection (a). *See Salem v. Cmty. Sch. Corp. v. Richman*, 406 N.E.2d 269, 274 (Ind. Ct. App. 1980) (superintendent did not have burden to inform school board of its statutory requirement to give him written notice of contract nonrenewal). Indeed, it would be unfair to expect a manufacturer to know what information and documents a dealer had failed to provide, so that it could make such a request. Therefore, the Court finds that because the Plaintiffs never provided all of the documents and information required under Indiana Code § 9-23-3-22(a) to Utility, the sixty day time period within which to send Seller and Peterbilt a notice of its disapproval of the Proposed Sale was never triggered, and Utility had no obligation to send its notice via certified mail or otherwise.

Because the Court has determined that Utility did not have an obligation to comply with the notice requirements of Indiana Code § 9-23-3-22(b), the Court further finds that Utility did not constructively approve the Proposed Sale, nor did it commit an unfair practice under Indiana Code § 9-23-3-22(d). It is irrelevant whether Seller and Peterbilt actually knew of the specific reason for Utility's disapproval.[2] It is only relevant that the Plaintiffs did not comply with the statute under which they seek to obtain constructive approval for the Proposed Sale from Utility, despite already being aware that they would not receive it expressly. The Court will not permit an interpretation of the Indiana statute in question that would result in such a contravention of the statute's purpose.

---

[2] Mr. Riddle claims that he was never informed of the reason for Utility's disapproval (Dkt. 79-3 at 2); however, the emails between Mr. Jorgensen and Utility indicate that at least JX was aware of Utility's corporate policy against dual dealerships and that he had discussed Utility's disapproval with Mr. Riddle. Dkt. 62-2 at 2. The Court need not resolve this factual dispute in order to determine that the Plaintiffs did not meet their burden under the statute, thus it is not a question of material fact that would preclude summary judgment.

## IV. CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Partial Summary Judgment (Dkt. 35) is **DENIED**, and Utility's Cross-Motion for Partial Summary Judgment (Dkt. 60) is **GRANTED**.

**SO ORDERED.**

Date: 03/18/2013

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

David K. Herzog
FAEGRE BAKER DANIELS LLP - Indianapolis
david.herzog@faegrebd.com

Katrina Michelle Gossett
FAEGRE BAKER DANIELS LLP - Indianapolis
katrina.gossett@faegrebd.com

Ryan Michael Hurley
FAEGRE BAKER DANIELS LLP - Indianapolis
ryan.hurley@FaegreBD.com

Marc Allen William Stearns
HARRISON & MOBERLY
mstearns@harrisonmoberly.com

Michael P. Shanahan
HARRISON & MOBERLY
mshanahan@harrisonmoberly.com

William Norris Ivers
HARRISON & MOBERLY
wivers@harrisonmoberly.com

Peter S. Kovacs
STEWART & IRWIN P.C.
pkovacs@silegal.com

Ronald C. Smith
STEWART & IRWIN P.C.
rsmith@silegal.com